905 F.2d 754
 DUNBAR CORPORATION; Robert L. Maxey, Plaintiffs-Appellants,
v.
James LINDSEY, Frederick A. Perrenot; A.B. Whittington;
James M. Ellis; Lt. Gen. John W. Foss; United
States of America, Defendants-Appellees.
 No. 89-2714.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1990.
Decided June 8, 1990.
As Amended June 19, 1990.
 
 Mark A. Sternlicht, H. Gerald Beaver, Beaver, Thompson, Holt & Richardson, P.A., Fayetteville, for plaintiffs-appellants.
 Paul Martin Newby, Asst. U.S. Atty., Raleigh, for defendants-appellees; Margaret Person Currin, U.S. Atty., Raleigh, on brief.
 Before SPROUSE, CHAPMAN, and WILKINS, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Dunbar Corporation (Dunbar) and Robert L. Maxey, president and owner of Dunbar, brought this action against defendants-appellees, James Lindsey, Frederick A. Perrenot, James M. Ellis, and A.B. Whittington (in their individual capacities), John W. Foss (in his official capacity), and the United States. Dunbar alleges an unconstitutional seizure of possession of its land without due process in violation of the Fifth Amendment and a claim for damages under the Federal Tort Claims Act (FTCA), seeking monetary damages and declaratory and injunctive relief. The district court dismissed the suit for lack of subject matter jurisdiction, finding that since Dunbar actually sought to quiet title to the real property, it must bring its action under the Quiet Title Act (QTA). For the reasons given below, we reverse and remand for further proceedings.
 
 
 2
 * The property at issue, a strip of land 100 feet in width and containing about 10.56 acres, is located in Cumberland County, North Carolina, adjacent to Fort Bragg, North Carolina. Seaboard Systems Railroad, Inc. (Seaboard), abandoned a portion of its railroad right-of-way in 1979 and decided to sell the subject property. In November 1980, it offered the land to the United States, which expressed no interest. After several years of continuing negotiations, Seaboard agreed to sell the former right-of-way land to Dunbar on November 7, 1983. Dunbar received a quitclaim deed in September 1984, which contained the following paragraph:
 
 
 3
 The Grantee acknowledges that the herein conveyance is made at its solicitation, and was not in any way initiated by the Grantor. The Grantor does not represent or warrant to the Grantee that it owns said land or has any specific title or interest in said land, and the Grantee hereby releases the Grantor, its officers and agents from any claim or demand resulting from this conveyance, or from any failure of or defect in the Grantee's title to said land conveyed by this deed.
 
 
 4
 On August 28, 1984, Dunbar wrote the United States asking whether the United States owned or controlled any of the property. On September 18, 1984, Frederick A. Perrenot, Director of Engineering and Housing at Fort Bragg, informed Dunbar that Fort Bragg "has no interest in the property ... and concurs with [Dunbar's] recordation." Dunbar subsequently purchased the property and properly recorded its deed.
 
 
 5
 Dunbar conveyed three tracts of land by corporate warranty deed to McCauley & McDonald Investments, Inc. (McCauley), which properly recorded the deed and built a convenience store on the tracts conveyed. Dunbar advertised the remainder of the land for sale and posted eight four-foot by four-foot signs thereon bearing the following language:
 
 FOR SALE OR LEASE
 COMMERCIAL PROPERTY
 ZONED C-3
 CITY WATER AND SEWER
 OWNER WILL IMPROVE
 CALL 497-5154
 
 6
 Dunbar sold all of the timber and pulpwood on the remaining land to Manchester Woodyards, Inc., which used heavy machinery to remove the timber and pulpwood. Dunbar also contracted to have the stumps removed and the property graded with fill dirt, a task finished by June 30, 1985.
 
 
 7
 On October 30, 1985, James M. Ellis, Chief of the Real Estate Division of the Savannah District Corps of Engineers, Department of the Army, notified Seaboard, Dunbar and McCauley by letter that the United States was asserting all right, title and interest to the land. On November 6, 1985, Dunbar asked Ellis for substantiation of the United States' claim to the property. On February 2, 1986, A.B. Whittington, an employee of the Department of Engineers of Fort Bragg, and some men wearing hard hats came on the property and were told by Maxey to leave and not to trespass again. On February 13, 1986, and without any notice, James Lindsey, the Commanding General of the XVIII Airborne Corps and Fort Bragg, sent Whittington and armed military police to the property, unoccupied at the time, to remove Dunbar's signs and post signs forbidding trespassing on the property of the United States. A fence was erected around the property by military personnel.
 
 
 8
 Dunbar filed suit on August 12, 1988. Count I asserts the constitutional claim that the individual defendants violated Dunbar's possessory interest in the property. This claim is based on the theory enunciated in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), whereby under certain circumstances a cause of action against government officials for damages arises from constitutional violations: the deprivation of property without due process of law. Count II alleges a claim against the United States under the FTCA. Both Counts I and II seek recovery for the loss of rents and profits that Dunbar would have earned from the property. Counts III, IV, and V seek the return of the property and an injunction against any future deprivation of the property without due process of law.
 
 
 9
 The defendants-appellees moved to dismiss for lack of subject matter jurisdiction and failure to state a claim under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. The district court granted the motion, because it found that the action was to quiet title and that the QTA was the exclusive means to challenge the United States' title. The court also held that the FTCA claim did not state a claim for which relief could be granted, reasoning that if the United States was the owner of the property, Dunbar had no viable tort claim.
 
 II
 
 10
 We turn first to Dunbar's claim that the United States is liable under the FTCA for the trespass of its employees on property in Dunbar's possession. United States' liability under the FTCA depends upon state law. 28 U.S.C. Sec. 1346(b) (1976).[1] The district court held that Dunbar did not have a claim under North Carolina law, explaining that it was "unpersuaded that plaintiffs' allegations pursuant to the FTCA state a claim for which relief may be granted. If the United States is the true owner of the property in question, then plaintiffs have no viable tort claim." Although we understand the district court's pragmatic focus on title, the court erred in applying North Carolina law.
 
 
 11
 Under North Carolina law, "[t]he essence of a trespass to realty is the disturbance of possession." Matthews v. Forrest, 235 N.C. 281, 283, 69 S.E.2d 553, 555 (1952). As a result, a plaintiff may bring an action in trespass alleging that either "he is the owner of described lands" or "he is in the lawful possession of described lands," and that "the defendant has committed acts of trespass against his possession to his damage, and the amount thereof." Short v. Nance-Trotter Realty, Inc., 262 N.C. 576, 578, 138 S.E.2d 210, 211 (1964) (emphasis added). In the latter circumstance, "the plaintiff is not required to prove title, but only lawful possession and damages for interfering therewith." Id. See also Dobbs, Trespass to Land in North Carolina--Part I. The Substantive Law, 47 N.C.L.Rev. 31, 43 (1968) ("[T]itle is not an issue at all in a trespass case where the plaintiff sues only to vindicate his possessory rights.").
 
 
 12
 Dunbar's cause of action under North Carolina law hinges on whether it was in "lawful possession" of the property at the time of the alleged trespass. Lawful possession has two components. First, Dunbar must have possession of the property. It is sufficient that Dunbar was "either actually or constructively in possession of the land." Matthews, 235 N.C. at 283, 69 S.E.2d at 555. " 'Actual possession of land consists in exercising acts of dominion over it, and in making the ordinary use of it to which it is adapted, and in taking the profits of which it is susceptible.' " Id., 235 N.C. at 284, 69 S.E.2d at 556 (quoting State v. Baker, 231 N.C. 136, 139, 56 S.E.2d 424, 426 (1949)). See also Dobbs, Trespass to Land in North Carolina, 47 N.C.L.Rev. at 45 ("Actual possession involves physical presence upon the land or upon some portion of it, and although this presence need not be continuous, it must involve more than an occasional or casual entry."); 75 Am.Jur.2d Trespass Sec. 25 (1974) (actual possession shown "where, by the particular use [one] makes of the land, [one] indicates with precision the extent to which he proposes to enjoy it to the exclusion of others.").
 
 
 13
 Dunbar contends that it had actual possession of the property through its conveyance of three tracts of the property to McCauley, which constructed a convenience store; its erection of large signs on the property advertising its availability for sale or lease; its improvement of the property by selling the timber and pulpwood and by grading the land; and its actions excluding the employees of the United States from the land. We find that this use of the property is more than sufficient to show actual possession under Matthews and Baker.
 
 
 14
 Second, Dunbar's possession of the property must be "lawful." However, what "lawful" means is never fully elucidated in North Carolina case law. Nevertheless, it seems clear that Dunbar's possession of the land was lawful by any definition. Dunbar was no wrongful trespasser; it purchased the land and properly recorded a quitclaim deed. Dunbar had reason to believe in good faith that its title was good, especially against the United States. Dunbar sought and received assurances from the United States that it did not have any ownership of or interest in the land. Dunbar then took possession of the land with the full knowledge and blessing of the United States. Finally, Dunbar sold a portion of the land and developed another portion, again without any objection by the United States. Dunbar's good faith possession of the land under at least a claim or color of right should render its possession "lawful."
 
 
 15
 We observe that it is uncertain whether North Carolina's requirement that the possession be lawful has any meaning at all, given that most cases do not mention it. See Frisbee v. Town of Marshall, 122 N.C. 760, 765, 30 S.E. 21, 23 (1898) (" 'Possession alone is sufficient to maintain trespass against a wrongdoer.' " (citation omitted)); and Horton v. Hensley, 23 N.C. 128, 129-30 (1840) ("[P]ossession alone is sufficient to maintain an action of trespass against mere tort feasors.") (quoting Myrick v. Bishop, 8 N.C. 267, 267 (1821)). As a result, Dobbs has concluded that " '[l]awful' possession is in fact any possession." Dobbs, Trespass to Land in North Carolina, 47 N.C.L.Rev. at 43 n. 75 (emphasis added).[2]
 
 
 16
 The illusory bite of the requirement that possession be "lawful" is further demonstrated by the fact that, under North Carolina law, even a possessor with no claim of title has rights against the true owner. In Kaylor v. Sain, 207 N.C. 312, 176 S.E. 560 (1934), the North Carolina Supreme Court strongly implied that a possessor of land may maintain a trespass action against the owner if his entry were sufficiently forcible. Similarly, in Spinks v. Taylor, 303 N.C. 256, 278 S.E.2d 501 (1981), the court held that a landlord may not take possession of leased premises subject to forfeiture against the will of a tenant, i.e., over the tenant's objection. Therefore, even if Dunbar's possession was unlawful, which it was not, Dunbar's objections to the United States' initial incursions onto and subsequent occupation of the property rendered the United States' actions forceful and actionable under North Carolina law.
 
 
 17
 Although Kaylor and Spinks deal primarily with the landlord/tenant relationship, they apply equally to any dispute between an owner and possessor of property. These cases underscore the North Carolina Supreme Court's prohibition against the use of force in resolving property disputes:
 
 
 18
 "It is urged that the owner of real estate has a right to enter upon and enjoy his own property. Undoubtedly, if he can do so without a forcible disturbance of the possession of another; but the peace and good order of society require that he shall not be permitted to enter against the will of the occupant.... He may be wrongfully kept out of possession, but he cannot be permitted to take the law into his own hands and redress his own wrongs. The remedy must be sought through those peaceful agencies which a civilized community provides for all its members. A contrary rule befits only that condition of society in which the principle is recognized that
 
 
 19
 He may take who has the power, And he may keep who can.
 
 
 20
 If the right to use force be once admitted, it must necessarily follow as a logical sequence, that so much may be used as shall be necessary to overcome resistance, even to the taking of human life."Spinks, 303 N.C. at 262-63, 278 S.E.2d at 505 (quoting Reader v. Purdy, 41 Ill. 279, 285 (1866)).
 
 
 21
 Given North Carolina's extensive protection to the possessors of property, especially those with a claim of title, and its declared public policy against the use of force, we conclude that North Carolina courts would find that Dunbar had alleged a cause of action in trespass against the United States. Therefore, we hold that the district court erroneously dismissed Dunbar's claim under the FTCA.
 
 III
 
 22
 We next turn to Dunbar's claim under Bivens that the individual defendants violated Dunbar's rights to due process under the Fifth Amendment. Preliminarily, we analyze Dunbar's contention that its claim is not precluded by the Quiet Title Act (QTA). The district court held that it was, reasoning that since "the dispute between the parties lies in title to the property, the QTA must apply." We disagree.
 
 
 23
 The QTA waives sovereign immunity to quiet title actions against the United States: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest...." 28 U.S.C. Sec. 2409a(a) (1982). It is clear that the QTA is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block v. North Dakota ex rel. Bd. of University and School Lands, 461 U.S. 273, 286, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). Under the QTA, this court has equated the requirement of a disputed title with disputed ownership. Landow v. Carmen, 555 F.Supp. 195, 197 (D.Md.1983) (citing Fulcher v. United States, 632 F.2d 278 (4th Cir.1980)). Conversely, any challenge to a non-ownership interest in real property is not precluded by the QTA. In this case, Dunbar is not claiming title to or ownership of the property; it is asserting a non-ownership interest in the property, namely a possessory interest. Dunbar's complaint alleges only that the individual defendants denied Dunbar its "lawful possession and use of the property." Moreover, Dunbar requested injunctive relief and damages for its lost rents and profits, which are fully consistent with an action for trespass to a possessory interest under North Carolina law. See Frisbee v. Town of Marshall, 122 N.C. 760, 765, 30 S.E. 21, 23 (1898) (where court limited damages "to such injury to the possession as diminishes her profits and uses, and not extended to any injury to the free-hold."). Therefore, we hold that the QTA is not plaintiffs' exclusive remedy,[3] and we must explore Dunbar's Bivens claim.
 
 IV
 
 24
 The issue is whether Dunbar has a cause of action under Bivens. This necessitates a three-step inquiry. First, does Dunbar have a property right under North Carolina law? Second, is this property right protected under the Due Process Clause of the Fifth Amendment? Third, does Dunbar have a Bivens cause of action to enforce this constitutionally protected property right against the individual defendants? The district court held that Dunbar failed to show any of these steps:
 
 
 25
 Plaintiffs' argument fails to address the fact that the lawfulness of their possession is not at all clear or the complication that the entity alleging ownership and rightful possession is the United States government. They further fail to persuade the court that North Carolina law affords them a property right which would warrant constitutional protection. Finally, the circumstances of defendants' taking possession of the property, though far from laudatory, do not warrant constitutional intervention.
 
 
 26
 We find to the contrary.
 
 
 27
 Under the first inquiry, North Carolina law determines whether Dunbar has any property rights protected by the Fifth Amendment's Due Process Clause. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). As we discussed above concerning Dunbar's claim under the FTCA, North Carolina law grants significant protection to Dunbar's possessory interest in the property. Furthermore, Dunbar's interest is unaffected by the fact that the United States is alleging an ownership interest in the property; this fact could be relevant if Dunbar had sought title by adverse possession, because such a claim may not be asserted against the United States. See 28 U.S.C. Sec. 2409a(n) (Supp. V 1987); United States v. Pappas, 814 F.2d 1342 (9th Cir.1987). Dunbar makes no such claim.
 
 
 28
 Under the second inquiry, it is plain that the Due Process Clause does not "safeguard only the rights of undisputed ownership." Instead, "it has been read broadly to extend protection to 'any significant property interest.' " Fuentes v. Shevin, 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972) (quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786-87, 28 L.Ed.2d 113 (1971)). In Fuentes, the Court noted that "as long as there was 'some dispute' as to the right of continued possession, a possessor is entitled to due process." Florida Pawnbrokers and Secondhand Dealers Ass'n, Inc. v. Fort Lauderdale, 699 F.Supp. 888, 891 (S.D.Fla.1988) (quoting Fuentes, 407 U.S. at 87 n. 17, 92 S.Ct. at 1997 n. 17). Due process "extends to property rights less substantial than full legal title.... Even a merely arguable right of possession constitutes property." Federal Deposit Ins. Corp. v. Morrison, 747 F.2d 610, 614 (11th Cir.), cert. denied, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1984)) (citing Fuentes, 407 U.S. at 86-87 n. 16, 92 S.Ct. at 1997 n. 16). Where a possessory interest is shown, then, it is irrelevant for due process purposes that another party may have superior legal title. See Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (where the Court found that a materialmen's liens arising under Maine's commercial code were "property," even though the United States held a paramount lien that probably rendered the materialmen's liens nearly worthless); Wolfenbarger v. Williams, 774 F.2d 358 (10th Cir.1985), cert. denied sub nom. Tannery v. Wolfenbarger, 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986) (issue of whether pawnbroker will lose her rights in stolen property is irrelevant to due process claim). Accordingly, we hold that Dunbar's possessory interest in the property under North Carolina law constitutes a significant property interest protected by the Fifth Amendment's Due Process Clause.
 
 
 29
 Under the third inquiry, we must ascertain the uncertain law regarding when a Bivens action is available against government officials for the violation of constitutional rights. Relying on the district courts' "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. Sec. 1331 (1982), the Supreme Court has held that the Constitution itself supports a private cause of action for damages against federal officials. Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Court justified the creation of a Bivens cause of action on the rule that " 'where federally protected rights have been invaded, ... courts will be alert to adjust their remedies so as to grant the necessary relief.' " Id., 403 U.S. at 392, 91 S.Ct. at 2002 (quoting Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 776-77, 90 L.Ed. 939 (1946)). As a result, the Court has permitted Bivens actions for money damages against federal officers for violations of the Fourth Amendment, Bivens, supra; the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); and the Cruel and Unusual Punishment Clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).
 
 
 30
 However, the Court has recently "responded cautiously to suggestions that Bivens remedies be extended into new contexts." Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). There the Court reemphasized that a Bivens action is appropriate only where there are " no 'special factors counselling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy." Id., 487 U.S. at 421, 108 S.Ct. at 2466 (quoting Davis, 442 U.S. at 246-47, 99 S.Ct. at 2277-78, and Carlson, 446 U.S. at 18-20, 100 S.Ct. at 1471-72). However, the Court has not fully fleshed out these considerations, making our task more difficult.
 
 
 31
 First, the Court has found the existence of "special factors counselling hesitation" primarily in military, civil service, and social security situations. More particularly, the Court has focused on whether the other executive or legislative branches either wield the constitutional authority to enforce constitutional values, such as in the military sphere, or simply possess greater competence to do so, as in the civil service and social security contexts.[4] Second, the Court has noted that an "explicit congressional declaration" to preclude a Bivens remedy could be established "by [the] statutory language, by [the] clear legislative history, or perhaps even by the statutory remedy itself." Bush, 462 U.S. at 378, 103 S.Ct. at 2411. Third, the Court has stated that "equally effective" alternative remedies provided by Congress could preclude a Bivens cause of action. However, in Chilicky, the Court indicated that Congress need only devise "what [Congress] considers adequate remedial mechanisms for constitutional violations." Chilicky, 487 U.S. at 423, 108 S.Ct. at 2468. This shift in language has led the Court to deny many Bivens claims.[5]
 
 
 32
 Mindful of the Court's current disposition, we nevertheless find that Dunbar has stated a cause of action under Bivens. First, we note that the Court has already allowed a Bivens action under the Fifth Amendment's Due Process Clause in Davis. Second, we do not find any special factors present here, where neither military discipline, federal personnel policy, nor any particular congressional competency is involved. Moreover, we do not discern any other "special factors" that should affect our decision.[6] Third, Congress has neither expressed nor implied any intent to preclude Bivens causes of action in this situation. Since the Quiet Title Act concerns only claims of title, not possession, against the United States, it cannot justify the preemption of a Bivens action.
 
 
 33
 Fourth, Congress has not provided an adequate alternative remedy to vindicate the violation of possessory rights to property. The QTA gives no remedy at all. It is arguable that the FTCA gives Dunbar an adequate remedy. However, in Carlson, the Supreme Court rejected the notion that a Bivens claim is precluded by the FTCA:
 
 
 34
 [N]othing in the ... [FTCA] or its legislative history ... show[s] that Congress meant to pre-empt a Bivens remedy or to create an equally effective remedy for constitutional violations.
 
 
 35
 * * * * * *
 
 
 36
 Four additional factors, each suggesting that the Bivens remedy is more effective than the FTCA remedy, also support our conclusion that Congress did not intend to limit respondent to an FTCA action. First, the Bivens remedy, in addition to compensating victims, serves a deterrent purpose.... Because the Bivens remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States.
 
 
 37
 * * * * * *
 
 
 38
 Second, our decisions, although not expressly addressing and deciding the question, indicate that punitive damages may be awarded in a Bivens suit.... But punitive damages in an FTCA suit are statutorily prohibited. 28 U.S.C. Sec. 2674....
 
 
 39
 Third, a plaintiff cannot opt for a jury in an FTCA action, 28 U.S.C. Sec. 2402, as he may in a Bivens suit....
 
 
 40
 Fourth, an action under FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward.... Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules.... The question whether respondent's action for violations by federal officials of federal constitutional rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution.
 
 
 41
 Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.
 
 
 42
 Carlson v. Green, 446 U.S. at 19-23, 100 S.Ct. at 1471-74 (footnotes and citations omitted). We find this reasoning persuasive and controlling.
 
 
 43
 Fifth and finally, the decisions of the Supreme Court denying Bivens actions have involved facts quite distinguishable from the instant case. For example, in Bush the plaintiff, an engineer employed at the George C. Marshall Space Flight Center, a facility operated by the National Aeronautics and Space Administration (NASA), brought an action under the First Amendment after he was demoted for making a number of public statements critical of the Center. In denying the claim, the Court noted:
 
 
 44
 Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures--administrative and judicial--by which improper action may be redressed. They apply to a multitude of personnel decisions that are made daily by federal agencies. Constitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within this system.
 
 
 45
 Bush, 462 U.S. at 385-86, 103 S.Ct. at 2415 (footnote omitted). In his concurrence, Justice Marshall went further, asserting that "the procedure provided by the civil service scheme is in many respects preferable to the judicial procedure under a Bivens action." Id., 462 U.S. at 391, 103 S.Ct. at 2418.
 
 
 46
 Similarly, in Chilicky plaintiffs challenged under the Fifth Amendment's Due Process Clause the termination of their disability benefits under Title II of the Social Security Act. The Court rejected plaintiffs' Bivens cause of action, explaining that "the system for protecting their rights is, if anything, considerably more elaborate than the civil service system considered in Bush." Chilicky, 487 U.S. at 425, 108 S.Ct. at 2468. This system enabled the plaintiffs, after the state agency's denial of benefits, to seek two levels of administrative review and then judicial review, including review of constitutional claims.
 
 
 47
 In stark contrast, no comprehensive system exists to protect Dunbar's possessory interest in the land. Indeed, only state law provides some basis for the vindication of Dunbar's rights. In no way does this provide an adequate (and certainly not an equally effective) means set up by Congress for the protection of constitutional rights. For these reasons, we hold that Dunbar has a Bivens cause of action against the individual defendants. Under the allegations of the complaint, which must be accepted as true for consideration of the defendants' motion, we have the military power of the United States being used in peacetime to remove a citizen, claiming under color of title, from the lawful possession of land. The underlying purpose of the Bill of Rights is to protect the people from the power of the government. There are few acts that could more grievously offend this purpose and the letter and the spirit of our Constitution than the use of military force to resolve a simple land line dispute.
 
 V
 
 48
 We now address the United States' argument that Dunbar's complaint lacked the required specificity to withstand a defense of qualified immunity and therefore the district court could have dismissed the complaint for failure to state a claim upon which relief could be granted under Rule 12 of the Federal Rules of Civil Procedure. We disagree.
 
 
 49
 It is undisputed that "government officials performing discretionary functions ... [have] a qualified immunity." As a result, they are "shield[ed] ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). See also Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1986). The scope of this immunity "turns on the 'objective legal reasonableness' of the [allegedly unlawful official] action." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).
 
 
 50
 In setting the boundaries of qualified immunity, the Supreme Court has recognized that "permitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Anderson, 483 U.S. at 638, 107 S.Ct. at 3038. As a result, the Supreme Court has urged resolution of a qualified immunity defense by the trial judge at the summary judgment stage, recommending that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. To further this goal, some courts have imposed on plaintiffs a "heightened pleading standard," in which "plaintiffs must, at the very least, specify the 'clearly established' rights they allege to have been violated with 'sufficient( ) precis(ion) to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds.' " Martin v. Malhoyt, 830 F.2d 237, 254 (D.C.Cir.1987) (footnote omitted) (quoting Hobson v. Wilson, 737 F.2d 1, 29 (D.C.Cir.1984)). This standard also "bears on the degree of factual specificity required in plaintiff's complaint." Id. at 254 n. 41 (emphasis in original).
 
 
 51
 The United States argues that Dunbar's complaint is "devoid of specific factual allegations against the individual defendants and merely used conclusory claims." The United States explains that Dunbar failed to plead the following to show that the defendants violated a "clearly established right:" (a) that Dunbar had a "lawful property right;" (b) that each individual defendant directly participated in the deprivation of that right; and (c) that Dunbar was not given due process to determine if the taking was illegal. Instead, the United States points out, Dunbar's complaint simply asserts that the individual defendants, "by virtue of their authority as servants and agents of the United States ..., have subjected the Plaintiffs or caused Plaintiffs to be subjected to a deprivation of their rights, privileges and immunities secured by the Fifth Amendment which guarantees the right not to be deprived of property without due process of law."
 
 
 52
 We agree with the Martin court that a "heightened pleading standard" is highly appropriate in actions against government officials. However, when the complaint is read as a whole, we find that it has alleged its claims with sufficient precision to clearly advise the United States of the nature of its claims. Indeed, the factual allegations in Dunbar's complaint detail satisfactorily the actions of the individual defendants and leave no doubt that Dunbar is claiming that these individual defendants violated its constitutionally protected possessory interest in the property. While even more specificity would have been preferable, we do not require that Dunbar spell out in explicit detail the legal niceties of its claim. Certainly Dunbar's complaint does not come close to subjecting the individual defendants to a " 'fishing expedition in government waters' ... on the basis of wholly unsubstantiated charges. Martin, 830 F.2d at 257 (quoting Ellsberg v. Mitchell, 807 F.2d 204, 208 (D.C.Cir.1986)). Therefore, we find that Dunbar's complaint satisfies the "heightened pleading standard."
 
 VI
 
 53
 Finally, the United States contends that Dunbar failed to properly serve the individual defendants Perrenot and Ellis with a summons and complaint, as required in Fed.R.Civ.P. 4(c)(2)(C)(i), (ii). As a result, the United States asserts, the district court should have dismissed the case for lack of personal jurisdiction pursuant to Rule 12(b)(2) and (5). These objections, however, are waived if not asserted in a responsive pleading or amendment per Rule 15(a) or if omitted from a motion to consolidate defenses per Rule 12(g). The record shows that the individual defendants properly moved to dismiss and did not waive their right to object. However, the district court did not reach this issue in its opinion. And since the record does not satisfactorily enable this court to ascertain whether the individual defendants' objection has merit, we are unable to decide this issue and so remand it to the district court.
 
 
 54
 For the above reasons, we find that the district court erred in dismissing Dunbar's FTCA and Bivens claims, and we remand the case to the district court for further proceedings in accordance with this opinion.
 
 
 55
 REVERSED AND REMANDED.
 
 
 
 [1]
 Section 1346(b) of the FTCA states in part:
 [T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
 
 
 [2]
 Although Frisbee, Horton, and Myrick emphasize that the trespasser be a "wrongdoer" or "tort feasor," Dunbar's complaint, which we must accept as true, claims that the defendants-appellees are in fact "wrongdoers" and "tort feasors."
 
 
 [3]
 This case is easily distinguishable from Crumpacker v. Andrus, 516 F.Supp. 286 (N.D.Ind.1981), where the court held that the plaintiff's action was precluded by the QTA. The court noted that "plaintiffs in their complaint denominate[d]" their action as "one to quiet title" and stated that plaintiffs' "additional requests for injunctive and monetary relief do not alter the essential character of the suit." Id. at 290 (emphasis added). Here, Dunbar has not denominated its action as "one to quiet title" and has requested only injunctive and monetary relief limited to lost profits
 
 
 [4]
 For example, the Court has prevented members of the armed forces from asserting causes of action against their superiors in Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), reasoning primarily that Congress has "plenary control over rights, duties, and responsibilities in the framework of the military establishment," id., 462 U.S. at 301, 103 S.Ct. at 2366, and that military discipline would be undermined by the creation of officer liability, id., 462 U.S. at 304, 103 S.Ct. at 2367-68. In addition, Bush v. Lucas, 462 U.S. 367, 380-81, 103 S.Ct. 2404, 2412-13, 76 L.Ed.2d 648 (1983), dismissed a federal civil servant's action for an alleged violation of his First Amendment rights, explaining that Congress was more qualified to make difficult decisions regarding "federal personnel policy." Finally, in Chilicky, the Court rejected a cause of action under the Fifth Amendment's Due Process Clause for fair treatment in the administration of the Social Security Act, explaining, as the Court did in Bush, that Congress was more competent at " 'balancing government efficiency and the rights of individuals.' " Chilicky, 487 U.S. at 425, 108 S.Ct. at 2469 (quoting Bush, 462 U.S. at 389, 103 S.Ct. at 2417)
 
 
 [5]
 For example, in Bush the Court rejected plaintiff's Bivens action, even though the "existing remedies do not provide complete relief for the plaintiff." Bush, 462 U.S. at 388, 103 S.Ct. at 2417. Likewise, in Chilicky, the Court conceded that the Social Security Act "makes no provision for remedies in money damages against officials responsible for unconstitutional conduct...." Chilicky, 487 U.S. at 424, 108 S.Ct. at 2468. In both cases, the Court was satisfied that the alternatives provided by Congress were "adequate," although there is no doubt that they were not "equally effective" to a Bivens action. It is self-evident that the Court has made it easier for Congress to set its own standards to remedy constitutional violations and harder for plaintiffs to make out Bivens claims
 
 
 [6]
 For example, we do not believe that allowing a Bivens action in this case would be judicially unmanageable or would create a danger of deluging the federal courts with claims