UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MILDRED MARIE WHITE; PATSY ANN
MCCOY; ROBERT CECIL BRINSON;
CLIFTON CONNER DEWITT; SAMUEL
NEWTON; WILLIAM CLEN MATTOCKS;
HAROLD MACK MCCOY; FRED DAVIS
DOBSON,

No. 95-2177

Plaintiffs-Appellants,

v.

MICHAEL P. DOWNS; JAMES A.
CATHCART,
Defendant-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Fox, Chief District Judge.
(CA-94-122-4-CV-F1)

Argued: January 27, 1997

Decided: April 30, 1997

Before RUSSELL and WILKINS, Circuit Judges, and
OSTEEN, United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jeffrey Stephen Miller, Jacksonville, North Carolina, for
Appellants. Stephen Aubrey West, Assistant United States Attorney,

Raleigh, North Carolina, for Appellees. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Barbara D. Kocher, Assistant United States Attorney, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This case involves a set of claims brought by eight civilians against two military officers affiliated with the Marine Corps Base at Camp LeJeune, North Carolina, alleging violations of their constitutional rights. Plaintiffs allege in their <u>Bivens</u> action that Michael P. Downs, the Commanding General of Camp LeJeune, and James A. Cathcart, Downs' Chief of Staff and second-in-command of Camp LeJeune, violated their Fourth Amendment rights by authorizing an unconstitutional search and seizure. The district court stayed discovery pending a ruling on the dispositive motion and subsequently granted Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons that follow, we affirm the decision of the district court.

I.

At the time the alleged unconstitutional acts occurred, Plaintiffs were civilians making their livings cutting hair at three barber shops located on the base at Camp LeJeune. While waiting to get his haircut on July 19, 1991, Chief Warrant Officer J. McCaslin, Officer in Charge of the Criminal Investigation Division ("CID") of the military base, observed two marines paying the head barber for their haircuts at the cash register. Each haircut costs three dollars.**1** The head barber

_____

**1** Head barbers receive a fifty-eight percent commission on haircuts and a seventy-three percent commission on all other services. Line barbers receive approximately five percent less in commissions than the head barbers. The remainder goes to the federal government.

2

duly received three dollars from each marine but only recorded one sale in the cash register. McCaslin then observed the head barber pocketing the remaining three dollars.

In the wake of McCaslin's observance, CID contacted the Review and Analysis Branch of the Department of Morale, Welfare, and Recreation ("MWR"), whereupon it was discovered by the CID that MWR had conducted unannounced "spot checks" of the various barber shops on the base. These random checks had revealed that "the registers always contain[ed] more money than on the register receipt; however, when the daily activity reports [were] turned in the number on the register tapes and the amount of money turned in balance[d]." (McKee Aff., J.A. at 48.) This led CID to conduct a "constant visual surveillance" of three barber shops on the base. Over a period of four days, August 5, 12, 15, and 19, 1991, surveillance teams with at least two "accredited criminal investigators" made head counts of those persons entering and exiting the barber shops. The investigators compared the number of those exiting with "fresh haircuts" to the number of customers reported by the barbers on their daily reports and the number of sales recorded on the daily cash register receipts. The results of the investigation indicated that there was a "substantial loss of government funds." Id.

Armed with this data, Staff Sergeant B. McKee, a criminal investigator with CID, presented sworn testimony to General Downs on August 28, 1991, for the purpose of obtaining authorization to conduct searches of three barber shops. McKee's three affidavits summarized McCaslin's eyewitness observation, MWR's spot check findings, and CID's visual surveillance. Each affidavit concluded with the following statement from McKee: "It is believed that this activity is an ongoing course of business for this barber shop and that stolen U.S. currency, and personal as well as U.S. government record keeping documentation is maintained within the barber shop . . . ." (J.A. at 49, 53, 57.) The Command Authorizations for Search and Seizure issued by Downs each limited the search to the three barber shops and authorized the seizure of the following items: cash register tapes, receipts, bookkeeping paraphernalia, U.S. currency, and record keeping documentation concerning the operation of the barber shops. The

3

Command Authorizations did not, however, direct the seizure of any specific person.[2]

On the same day as the Command Authorizations were issued, CID agents were accompanied by uniformed military police to the three barber shops in order to execute the searches. Plaintiffs allege that after the searches were executed each of them was seized, separated from the others, and kept under guard in isolation for varying periods of time while being interrogated. Plaintiffs were allegedly suspended without pay pending the investigation. No criminal charges were ever filed against any Plaintiff. Each Plaintiff was eventually reinstated.

Plaintiffs seek compensatory and punitive damages against Downs and Cathcart. The complaint states the following claims relevant to this appeal:

> 8. That at all times material hereto, including specifically the months of August and September of 1991, the defendant, JAMES A. CATHCART, was the Chief of Staff of Marine Corps Base, Camp Lejeune, North Carolina. That all of the actions of the defendant, MICHAEL P. DOWNS, complained of below, were undertaken with the advice, counsel, consent, and approval of the defendant, JAMES A. CATHCART, who acted in such a way to make him jointly liable with the defendant, MICHAEL P. DOWNS, for the plaintiffs' injuries.
>
> . . . .
>
> 10. That on or about August 28, 1991, the defendant, MICHAEL P. DOWNS, authorized persons under his command, specifically members of the Criminal Investigation Division (CID) of the Provost Marshal's office and other military policemen, to search the workplaces of the plain-

_____

[2] Plaintiffs contend that Downs gave further verbal orders contemporaneous with the issuance of the written Command Authorizations to the effect that "all barbers present in the shops be taken into custody, transported to the Provost Marshal's Office (PMO) and interrogated . . . ." (Br. of Appellants at 13.)

4

tiffs, to seize the persons of the plaintiffs, and to take them into custody and to search the persons and effects of the plaintiffs.

(Compl. ¶¶ 8, 10, J.A. at 7.)

The district court granted Defendants' motion to dismiss or, in the alternative, for summary judgment. As to Cathcart, the lower court reasoned that Plaintiffs failed to state what action or actions by Cathcart they attributed to Downs or what principles of law support their "novel theory of respondeat superior." (J.A. at 167.) As to Downs, the lower court concluded that no factual support existed to suggest that Downs authorized any actions other than those specified on the face of the Command Authorizations. Furthermore, the district court found that Downs was entitled to "something akin to quasi-judicial immunity" in fulfilling the duties of his office. (J.A. at 170.) Finally, even assuming that Downs did not possess any form of immunity, the district court concluded that the Command Authorizations were supported by probable cause as set forth in McKee's affidavits.

Plaintiffs appeal from the district court's order of May 4, 1995.

II.

The first issue on appeal is whether the district court erred in granting Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively, Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. We view the district court's ruling as converting Defendants' motion to dismiss into a motion for summary judgment as the district court considered affidavits and other materials submitted by the parties in reaching its decision.**3** Before considering whether the district court properly granted Defendants' motion,

_____

**3** <u>See</u> Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .").

5

the parameters of qualified immunity should be noted as it governs the resolution of this case.**4**

Government officials performing discretionary functions are generally protected from civil damages liability as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996). The policy reasons supporting such a rule are compelling: the substantial costs of permitting damages actions against government officials with the same force as against non-government individuals include the expense of litigation, the diversion of official energy from pressing public issues, the deterrence of able citizens from acceptance of public office, and the interference with the discharge of government business, to name a few. See generally Harlow, 457 U.S. at 814.

Thus, to effectuate these policies, this circuit has adopted a "heightened pleading standard" consistent with the Supreme Court's urging in Harlow that the issue of qualified immunity be resolved by the trial judge at the earliest possible stage of the litigation. Dunbar Corp. v. Lindsey, 905 F.2d 754, 763 (4th Cir. 1990); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (noting that qualified immunity is "an immunity from suit rather than a mere defense to liability" and "such pretrial matters as discovery are to be avoided if possible"). This standard requires a specification of the clearly established rights involved and relates to the degree of factual specificity required in the complaint. Dunbar, 905 F.2d at 763 (citations omitted).

---

**4** Indeed, when qualified immunity is asserted as a defense, the court reviewing such a defense "should assess, before anything else, whether the alleged conduct violated law clearly established at the time the conduct occurred." DiMeglio v. Haines, 45 F.3d 790, 798 (4th Cir. 1995). The court in DiMeglio went on to find that requiring a court to conduct a full review of such a claim on the merits would undermine the policy of qualified immunity. Specifically, "[s]uch a requirement would undermine one of the express purposes of immunity, which is, `to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.'" Id. (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

6

The heightened pleading standard finds its justification in the need to prevent "`fishing expedition[s] in government waters' . . . on the basis of wholly unsubstantiated charges," Dunbar Corp., 905 F.2d at 764 (internal citations omitted). In Harlow, the Court stated that once a defendant affirmatively pleads the defense of qualified immunity, a judge may determine

> not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.

Id. at 818 (emphasis added).

Although the district court did not address the issue of a heightened pleading standard in this case, we agree with the district court that the complaint and supporting materials fail to state a cognizable legal claim or, in the alternative, that there is no genuine issue as to any material fact, and Defendants are entitled to summary judgment as a matter of law.

Plaintiffs have premised their Bivens claim [5] on the assumption that because Downs and Cathcart were in charge of Camp LeJeune, they must have ordered the allegedly unconstitutional seizures. We are not compelled to address the merits of Plaintiffs' claim, but the point is too obvious and brief to gloss over before reaching the issue of qualified immunity.

Plaintiffs chose to sue the first- and second-in-command of a military base for claimed unconstitutional actions taken by a collection of individuals acting under their supervisors' command. To be sure,

_____

[5] See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971) (holding that a violation of the Fourth Amendment by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct).

Plaintiffs did not name those members of the military police or CID who executed the Command Authorizations as defendants in this suit. The proposition of imposing such liability on persons who did not engage in specific injury-inflicting conduct runs squarely into well-settled principles of law.

As the district court correctly noted, supervisory liability in civil rights cases is narrowly defined. Although there is no respondeat superior liability in Bivens actions, see Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); cf. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989) (holding that a municipality cannot be held liable in Bivens-type actions under a theory of respondeat superior), a supervisor could be held liable for the acts of a subordinate "only by proof of [his] direct culpability in causing the injury either by directly authorizing it or by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct." McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191, 1197 (4th Cir.) (citation omitted), cert. denied, 117 S. Ct. 72 (1996). Plaintiffs face a heavy burden of proof in supervisory liability cases. Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984).

Plaintiffs fail to meet this heavy burden of proof on two fronts. First, Plaintiffs fail to demonstrate any evidence of an unreasonable risk of harm from a specified source or that Defendants' "corrective inaction amounts to deliberate indifference or `tacit authorization of the offensive practices.'" Slakan, 737 F.2d at 372 (citation omitted). Other than the conclusory allegations in the complaint as referenced above, Plaintiffs have come forward with no evidence that either Downs or Cathcart directly authorized the seizures of the barbers or were deliberately indifferent to a known pattern of such unconstitutional conduct. Second, with respect to the heightened pleading standard in this case, Plaintiffs merely allege that the actions of Downs are attributable to Cathcart without offering any explanation whatsoever of Cathcart's specific involvement in the seizures. As to Downs, Plaintiffs allege that he directly authorized the seizure of the barbers. Downs responded with evidence in the form of the Command Authorizations demonstrating that he had not, in fact, authorized such seizures. The burden then fell to Plaintiffs to submit evidence in the form of affidavits or otherwise which "set[s] forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty

8

Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Plaintiffs have failed to meet this burden by not presenting any evidence that Downs authorized the seizure of the barbers or that Cathcart had any role in Downs' decision.

Accordingly, we conclude that the district court properly granted Defendants' motion to dismiss or, alternatively, for summary judgment.

III.

We turn now to the issue of the qualified immunity defense raised by Defendants.**6** Assuming that an individual is a government official performing discretionary functions, the crux of the qualified immunity analysis is the "objective legal reasonableness" of the official's alleged unconstitutional act viewed in the context of legal rules that were clearly established at the time the action was taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819-20 (1982)); Pritchett v. Alford, 973 F.2d 307 (4th Cir. 1992). In order to determine whether an officer's conduct is immunized, we employ a three-step analysis: 1) identify the specific constitutional right allegedly violated; 2) determine whether at the time of the alleged violation the right was clearly established; and 3) if the right were clearly established, determine whether a reasonable person in the officer's position would have known that doing what he did would violate that right. Pritchett, 973 F.2d at 312. The officer is entitled to immunity if the right were not clearly established at the relevant time or if a reasonable officer would not have known that his conduct violated the right.

Plaintiffs' constitutional claim is that Downs and Cathcart violated their Fourth Amendment rights by authorizing military personnel to

_____

**6** In consideration of the Supreme Court's admonition that it is "quite sparing in its recognition of claims to absolute official immunity[,]" we analyze this case on qualified immunity grounds to "avoid unnecessarily extending the scope" of absolute immunity. Forrester v. White, 484 U.S. 219, 224, 108 S. Ct. 538, 542, 98 L. Ed. 2d 555 (1988) (citations omitted).

9

search and seize Plaintiffs when they had no probable cause. A determination of whether the legal rule was clearly established at the relevant time turns on the level of abstraction at which the legal rule is assessed. The Fourth Amendment right to be searched and seized only upon a showing of probable cause, absent a recognized exception, is clearly established. It is, however, improper to analyze the applicable right at this level of generality and "would bear no relationship to the `objective legal reasonableness' that is the touchstone of Harlow." Anderson, 483 U.S. at 639; see also Taylor , 81 F.3d at 434. The inquiry must be more focused in order to make it possible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages. . . ." Davis v. Scherer, 468 U.S. 183, 195 (1984).

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

The reasonableness of Downs' and Cathcart's actions is not contingent upon whether probable cause actually existed. Hunter v. Bryant, 502 U.S. 224, 226-27 (1991). The doctrine of qualified immunity contemplates that law enforcement officials will make the occasional mistake in judgment. Malley v. Briggs, 475 U.S. 335, 343 (1986). A reasonable but mistaken conclusion that probable cause exists, for example, is tolerable because "officials should not err always on the side of caution" for fear of being sued. Davis, 468 U.S. at 196. On the other hand, qualified immunity does not protect against "plainly incompetent" judgments or judgments in "know[ing] violat[ion] of the law." Malley, 475 U.S. at 341. In determining whether Downs is entitled to qualified immunity, our analysis "must be filtered through the lens of the officer's perceptions at the time of the incident in question." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) (citation omitted). Thus, Downs and Cathcart will not be denied qualified

10

immunity for making a mistake, so long as that mistake is reasonable given the circumstances.

What sets this case apart from the standard qualified immunity scenario is the presence of the military. The general rule governing the search and seizure of civilians located on a military base and subject to the authority of the base commander is that as long as their actions are based on probable cause, "military personnel are authorized by statute to arrest and detain civilians for on-base violations of civil law[.]" United States v. Banks, 539 F.2d 14, 16 (9th Cir. 1976). As one court in this circuit has held:

> [A]s long as the military respects the rights guaranteed by the Fourth Amendment's prohibition against unreasonable searches and seizures, the military need not be bound by all of the procedural formalities that are imposed upon civilian law enforcement agencies.

United States v. Rogers, 388 F.Supp. 298, 301 (E.D. Va. 1975); see also United States v. Stuckey, 10 M.J. 347, 361 (1981) ("The commander's power to authorize searches of places and persons under his control exists to whatever extent it does exist because it complies with the Fourth Amendment's basic norm of reasonableness"); cf. Applewhite v. United States Air Force, 995 F.2d 997, 1000-01 (10th Cir. 1993) (holding that military personnel engaged in a sting operation did not violate clearly established Fourth Amendment rights in seizing a civilian based upon probable cause to believe she was participating in a narcotics transaction and holding her pending a determination whether civilian authorities would take over the investigation). Thus, it is clear that at the time Downs allegedly authorized the seizure of Plaintiffs, there was no clearly established law forbidding him to do so.

IV.

The evidence that McKee presented to Downs clearly established enough probable cause to support the issuance of the Command Authorizations. A Command Authorization, the military equivalent of a search warrant, must be supported by probable cause to satisfy the

11

Fourth Amendment. United States v. Harris, 403 U.S. 573, 577 (1971).[7] McKee's affidavits summarized over a month-long investigation of the barber shops in question. This investigation by the CID was set in motion by the eyewitness account of Officer McCaslin of a head barber pocketing half of the six dollars he received from two marines for two haircuts. CID then discovered that past spot checks of the base barber shops consistently revealed more money in the cash registers than on the cash register receipts. At the end of the day, however, the money in the cash registers and the cash receipts balanced. The CID then undertook constant visual surveillance wherein teams of military investigators conducted on-the-spot undercover observations of the barber shops over a period of four days.

Plaintiffs vigorously argue that the methods of collecting evidence during the visual surveillances were conclusory, therefore, Defendants' reliance on this evidence was unreasonable. In Plaintiffs' view, because the military investigators could not possibly distinguish between those marines exiting the barber shops under surveillance with fresh haircuts from any other marine exiting with short hair, it was unreasonable for Downs and Cathcart to rely on McKee's affidavits.

Qualified immunity is lost only if "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Malley, 475 U.S. at 344-45. Notwithstanding the pure speculation by Plaintiffs as to any effects of the allegedly flawed investigative methodologies, under the "totality-of-the-circumstances" approach to reviewing probable cause determinations, see Illinois v. Gates, 462 U.S. 213, 230 (1983), we hold that McCaslin's eyewitness account coupled with the MWR spot check evidence

_____

[7] Furthermore, search warrants may be issued only by a neutral and detached magistrate. See, e.g., United States v. Clutchette, 24 F.3d 577, 579 (4th Cir. 1994). As noted, this case presents a unique twist in that a military commander issued the search warrant. Military officials, like federal magistrates in the civilian realm, are empowered to issue search warrants consistent with the dictates of the Fourth Amendment and "must be neutral and detached and must perform[their] duties with a judicial rather than a police attitude." United States v. Ezell, 6 M.J. 307, 315 (1979) (internal quotations and citation omitted).

constituted ample probable cause for Downs and Cathcart reasonably to authorize the Command Authorizations.

Accordingly, reasonable officers in Downs' and Cathcart's positions could find probable cause to believe that a crime had been committed against the government.

V.

For the foregoing reasons, we affirm the decision of the district court in granting Defendants' motion to dismiss or, in the alternative, for summary judgment.

AFFIRMED

13