**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DAVID L. LYNN, JR.; ROBIN DIXON
LYNN; RODNEY LYNN; ROXANNE
LYNN; DAVID L. LYNN, SR.,
Plaintiffs-Appellants,

v.

DEBORAH WEST, in her individual

No. 96-1371

capacity and official capacity as an
agent of the State of North
Carolina; JANICE FAULKNER,
Secretary of Revenue, State of
North Carolina, in her official
capacity; STATE OF NORTH CAROLINA,
Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., District Judge.
(CA-94-577-2)

Argued: December 5, 1996

Decided: January 13, 1998

Before RUSSELL, WIDENER, and MICHAEL, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Michael wrote the opinion, in which Judge Russell and Judge Wid-
ener joined.

_____

**COUNSEL**

**ARGUED:** Terry Goodwin Harn, Chapel Hill, North Carolina, for Appellants. Christopher Edward Allen, Assistant Attorney General, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

MICHAEL, Circuit Judge:

The main question in this case is whether a North Carolina tax on illegal drugs is in reality a criminal penalty. North Carolina's Controlled Substance Tax (Drug Tax), N.C. Gen. Stat.§§ 105-113.105 through 105-113.113, imposes a special excise tax on"dealers" who illegally possess a sufficient quantity of a "controlled substance," as that term is defined in the state criminal code. The statute requires drug dealers to submit a form reporting their illegal possession and to pay the tax. In return, dealers are supposed to receive stamps to affix to the drugs before they are resold. Payment of the Drug Tax does not make possession or resale legal, however. It should come as no surprise that no drug dealer has ever filed a form and voluntarily paid this tax.

In 1993 North Carolina assessed a $390,000 tax liability against David Lynn, Jr. (Lynn) under the Drug Tax. Lynn and certain of his relatives filed a lawsuit against the state and two of its tax officials in the United States District Court for the Middle District of North Carolina challenging the constitutionality of the tax and alleging civil rights violations under 42 U.S.C. § 1983. The heart of the complaint is that the Drug Tax is a criminal penalty, not a tax. The district court properly dismissed part of the complaint for failure to state a claim and on the grounds of Eleventh Amendment immunity, but it erred in concluding that the Drug Tax is a true tax. This error led the court to invoke the Tax Injunction Act, 28 U.S.C. § 1341, and dismiss the claims for declaratory and injunctive relief. We hold that the Drug Tax is in reality a criminal penalty under Department of Revenue v. Kurth Ranch, 511 U.S. 767 (1994). Because the tax is a criminal penalty, federal court jurisdiction is not barred by the Tax Injunction Act.

2

We further hold that the Drug Tax, like any other criminal penalty, cannot be enforced without the constitutional safeguards that accompany criminal proceedings. We therefore affirm the district court in part and reverse in part.

I.

On March 1, 1993, state law enforcement agents obtained a warrant to search Lynn's residence in Reidsville, North Carolina. When both state and federal agents executed the warrant later that day, they discovered 970 grams of cocaine. Lynn was thereafter convicted on federal drug charges in the United States District Court for the Middle District of North Carolina. In that same proceeding the United States also obtained an order of forfeiture for Lynn's house and furniture under the corresponding criminal forfeiture statute, 21 U.S.C. § 853.

The cocaine seized at Lynn's house on March 1, 1993, was worth about $25,000. On March 2, 1993, after receiving notice of the seizure from the Sheriff of Rockingham County, the North Carolina Department of Revenue assessed a $389,125.20 Drug Tax liability against Lynn for unpaid taxes, penalties, and interest. According to the Department, Lynn owed a tax of $200 per gram on the 970 grams of cocaine taken from his house ($194,000), plus a 100% penalty for failure to pay the tax on time ($194,000), plus interest ($1,125.20). On March 4, 1993, Janice Faulkner, the North Carolina Secretary of Revenue, filed a Certificate of Tax Liability with the clerk of the Superior Court of Rockingham County, where Lynn resided. See N.C. Gen. Stat. § 105-242(c) (1996). On the same day the Department of Revenue obtained a writ of execution in Rockingham County, directing the sheriff to seize Lynn's personal property in order to satisfy the $389,000 assessment.

Around March 18, 1993, Lynn filed an objection to the assessment with the Department of Revenue and requested an administrative hearing under N.C. Gen. Stat. § 105-241.1. The administrative hearing was held on March 15, 1994, before an Assistant Secretary of Revenue. The Assistant Secretary issued his decision on May 9, 1994, sustaining the assessment and declaring it "to be final and immediately due and collectible." Lynn did not petition for a review of the Assistant Secretary's decision before the Tax Review Board. See N.C.

3

Gen. Stat. § 105-241.2 (1996). In the meantime, on April 12, 1994, the Sheriff of Rockingham County (in an effort to collect the assessment) had already seized some items of Lynn's personal property, including televisions and VCRs, stereo and Nintendo equipment, a grandfather clock, and an oak cabinet.

The Revenue Department assigned further responsibility for collection of the Drug Tax assessment against Lynn to Deborah West, a Revenue Enforcement Officer in the Controlled Substance Tax Division of the Department.[1] In an effort to collect, West (in July and August 1994) seized two cars originally purchased by Lynn, a 1992 Mitsubishi 3000GT and a 1976 Mercedes Benz 450SL. Robin Dixon Lynn, Lynn's current wife, claims that a contract she and Lynn signed in February 1993 gave her sole ownership of the Mitsubishi before it was seized by West. Rodney Lynn, who is Lynn's brother, claims that he owned the Mercedes when it was seized. The Department of Revenue also seized (and sold at public auction) a commercial building belonging to Lynn. Roxanne Lynn, Lynn's ex-wife, claims an interest in that building under a judgment lien from her divorce case against Lynn. Lynn's father, David Lynn, Sr., claims that he owns some of the seized property, presumably certain of the personal items taken by the sheriff.

In October 1994 Lynn, along with his relatives and ex-wife mentioned above, went to federal court to try to block North Carolina from collecting the Drug Tax assessment. They sued the state, Enforcement Officer West, and Secretary Faulkner, seeking compensatory damages under 42 U.S.C. § 1983 for various constitutional violations. They also sought declaratory and injunctive relief on the grounds that under Department of Revenue v. Kurth Ranch, 511 U.S. 767 (1994), further enforcement of the Drug Tax would violate the Double Jeopardy Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. The district court dismissed the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6)

---

[1] See N.C. Gen. Stat. § 105-242(a)(2) (1996) ("The Secretary may issue a warrant . . . to any revenue officer or other employee of the Department of Revenue charged with the duty to collect taxes, commanding the officer or employee to levy upon and sell the taxpayer's personal property . . . .").

4

and for lack of subject matter jurisdiction under Rule 12(b)(1). The district court concluded that (1) West, in her individual capacity, was entitled to qualified immunity, (2) North Carolina was immune from suit under the Eleventh Amendment, (3) West and Faulkner were entitled to Eleventh Amendment immunity on the claims for damages against them in their official capacities, and (4) the Tax Injunction Act, 28 U.S.C. § 1341, precluded subject matter jurisdiction over Lynn's claims for declaratory and injunctive relief. Lynn and the other plaintiffs appeal.

II.

Roxanne Lynn, David Lynn, Sr., Robin Dixon Lynn, and Rodney Lynn (the relatives) allege that West, a Revenue Enforcement Officer, is liable for damages in her individual capacity because she afforded them no due process before seizing their property to satisfy a tax assessment against someone else. The relatives argue that West acted outside her lawful authority and "is not protected by Qualified Immunity [because] her actions were not justified under state law and were patently unreasonable under the circumstances of this case." Br. of Appellants at 12. The district court held that West is protected by qualified immunity and dismissed the § 1983 claims brought against her in her individual capacity for failure to state a claim. We review a dismissal for failure to state a claim de novo, construing the factual allegations in the light most favorable to the plaintiffs. See Biggs v. Meadows, 66 F.3d 56, 59 (4th Cir. 1995).

We agree that the complaint fails to state a claim against West in her individual capacity. On West's motion to dismiss in district court the parties fully developed their arguments on whether the relatives' complaint states a claim for deprivation of a property interest under state law. These arguments, which are repeated to us, make clear that we do not need to reach the immunity question. Even accepting the facts as alleged, and drawing all reasonable inferences in favor of the relatives, the complaint does not indicate that West deprived them of any of their property. As we will explain, the allegations of one of the relatives reveal that her interest was not affected by anything that West did. The other three do not allege anything to establish that they had an ownership interest in any of the property seized. Because the relatives cannot identify a property interest affected, they have not

5

stated a claim under the Due Process Clause, and we need not consider whether the doctrine of qualified immunity applies to the claim. See DiMeglio v. Haines, 45 F.3d 790, 799 (4th Cir. 1995) (noting that claims directed at public officials may sometimes be dismissed at the pleading stage without considering immunity because"it may be readily apparent on the face of the plaintiff's complaint that, even accepting the facts as he alleges them to be, he cannot possibly prevail on the merits of his claim under current law"); see also Dunbar Corp. v. Lindsey, 905 F.2d 754, 759 (4th Cir. 1990) (analyzing Bivens action by first asking whether plaintiff has a property right under state law).

First, Roxanne Lynn complains that West violated her property rights by arranging for the sale of David Lynn, Jr.'s commercial building. The allegations in the complaint, however, do not permit any reasonable inference that the sale affected her interest in the property. When she divorced Lynn in 1990, Roxanne Lynn was awarded a judgment against Lynn that, among other things, required him to pay her a certain sum. Roxanne Lynn alleges that the judgment (which is recorded) operates to give her a lien against Lynn's property, including the commercial building. See N.C. Gen. Stat. § 1-234 (1996) ("[A] judgment . . . is a lien on the real property in the county where the same is docketed . . . ."). Under North Carolina law the Revenue Department's execution sale did not interfere with any interest Roxanne Lynn had as a lienholder; the sale was made subject to duly recorded prior liens.[2] As a result, the buyer took the property subject to her lien. Because her interest in the building was preserved, she has no claim that West took any steps to deprive her of her property.

Second, David Lynn, Sr. claims that West caused some of his property to be seized, but he has not identified the items of property that allegedly belong to him. We can only assume, by process of elimina-

_____

[2] See N.C. Gen. Stat. § 105-241(d) (1996) ("A tax lien . . . is not enforceable against . . . the holder of a duly recorded lien unless: (1) In the case of real property, a certificate of tax liability or a judgment was first docketed . . . . The priority of these claims and liens is determined by the date and time of recording, docketing, levy, or bona fide purchase.") (emphasis added).

6

tion, that he is referring to some of the televisions, VCRs, stereo equipment, or other personal items taken from his son, the subject of the Drug Tax assessment. Our assumption is not enough. Lynn, Sr.'s conclusory allegation that West seized his (unidentified) belongings fails to state a claim for deprivation of property.

Lastly, Robin Dixon Lynn and Rodney Lynn each claim that they own one of the cars seized by West. Robin Dixon Lynn's allegations regarding the 1992 Mitsubishi, however, do not reveal that she is the owner of record. David Lynn, Jr. bought the car in the name of Lynn's Auto Sales in September 1992. In February 1993 Lynn and Robin Dixon (who was then engaged to Lynn) agreed in writing that Robin would own the Mitsubishi. But the agreement (attached to the complaint) states that title would not be placed in her name until she began making payments on the car. Nothing in the pleadings suggests that Robin Dixon Lynn ever began making payments or received title to the car. Under North Carolina law ownership of a car does not change hands until the certificate of title has been assigned and the new owner makes application for a new title. See Nationwide Mut. Ins. Co. v. Hayes, 174 S.E.2d 511, 517 (N.C. 1970); N.C. Gen. Stat. § 20-72 (1996). Therefore, Robin Dixon Lynn has not alleged anything to show that she had title to the Mitsubishi under North Carolina law. See Dunbar Corp., 905 F.2d at 760 (noting that "North Carolina law determines whether [the plaintiff] has any property rights protected by the Fifth Amendment's Due Process Clause.") Similarly, Rodney Lynn claims that he owns the 1976 Mercedes, but his claim of ownership also falls short. In 1989 David Lynn, Jr. bought the Mercedes and registered it in his own name. In the face of this fact Rodney Lynn does not indicate when and how record title was transferred to him.

In sum, we conclude that none of the relatives has alleged anything to show that he or she has any property rights under state law that were affected by West's actions. Accordingly, we affirm the district court's conclusion that the relatives have failed to state a claim against West in her personal capacity.

III.

Lynn, the central plaintiff, seeks monetary and prospective relief from Enforcement Officer West and Secretary Faulkner in their offi-

cial capacities and from the State of North Carolina itself. All three defendants claim immunity under the Eleventh Amendment. The district court concluded that the Eleventh Amendment protects North Carolina from all claims "and bars the[ ] official-capacity claims [for monetary relief] against [ ] West and Faulkner." However, the court recognized that the Eleventh Amendment does not bar Lynn's claims for prospective relief against West and Faulkner in their official capacities. We agree with these rulings.

The Eleventh Amendment provides as follows: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign States." U.S. Const. amend. XI. The Eleventh Amendment applies to suits in federal court brought by a state's own citizens even though the language of the amendment would seem to limit its application to suits brought by "Citizens of another State." See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993); Harter v. Vernon, 101 F.3d 334, 337 (4th Cir. 1996).

Lynn has not suggested a valid reason, such as consent or congressional abrogation, why the Eleventh Amendment does not bar his suit against North Carolina. See generally Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985) ("[I]f a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action."); Fitzpatrick v. Bitzer , 427 U.S. 445, 456 (1976) (holding that Congress has power to abrogate Eleventh Amendment immunity under § 5 of the Fourteenth Amendment). Accordingly, we affirm the district court's determination that the State of North Carolina is entitled to Eleventh Amendment immunity.

As noted, Lynn also sued West and Faulkner in their official capacities. Under Ex parte Young, 209 U.S. 123 (1908), there is "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to `end a continuing violation of federal law.'" Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1132 (1996) (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Lynn seeks two forms of relief from West and Faulkner. First, he seeks monetary damages for loss of property he claims was seized in violation of the Fourteenth Amendment. Second, he seeks

8

declaratory and injunctive relief. He asks for a judgment declaring the Drug Tax to be unconstitutional because it (1) imposes multiple punishment in violation of the Double Jeopardy Clause, (2) amounts to a criminal penalty imposed without the required due process safeguards, and (3) is a bill of attainder. If the tax's present enforcement scheme is declared unconstitutional, Lynn seeks an injunction against West and Faulkner to stop their continuing efforts to collect the assessment.

The Eleventh Amendment bars Lynn's § 1983 claim for monetary damages against West and Faulkner in their official capacities. "[W]hen determining if an officer or entity enjoys Eleventh Amendment immunity a court must first establish whether the state treasury will be affected by the law suit." Harter, 101 F.3d at 340. In the action for monetary damages against West and Faulkner in their official capacities, North Carolina would pay any "final judgment awarded in a court of competent jurisdiction against a State employee . . . ." N.C. Gen. Stat. § 143-300.6(a) (1996). Therefore, the lawsuit could affect the state treasury. See Barfield v. Blackwood, 7 F.3d 1140, 1146 (4th Cir. 1993) (noting effect on state treasury and concluding that N.C. Gen. Stat. § 143-300.6(a) does not waive Eleventh Amendment immunity). "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945). Accordingly, we affirm the district court's conclusion that the Eleventh Amendment bars Lynn's § 1983 claim for monetary damages against West and Faulkner in their official capacities.

To the extent Lynn seeks a declaratory judgment and an injunction to block further enforcement of the Drug Tax, Ex parte Young does permit his action against West and Faulkner in their official capacities. In Ex parte Young the Supreme Court held that the Eleventh Amendment did not bar an action in federal court to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment. See Ex parte Young, 209 U.S. 123, 159-60 (1908).

> This holding has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely as

9

a shield, for those whom they were designed to protect. But the relief awarded in Ex parte Young was prospective only; the Attorney General of Minnesota was enjoined to conform his future conduct of that office to the requirement of the Fourteenth Amendment.

Edelman v. Jordan, 415 U.S. 651, 664 (1974).

The Eleventh Amendment therefore does not bar Lynn's official capacity claims for declaratory and injunctive relief. "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." Green v. Mansour, 474 U.S. 64, 68 (1985). Of course, a judgment declaring that the Drug Tax is a criminal penalty could impact the state treasury of North Carolina, at least until the state implements enforcement procedures that conform to the requirements of the United States Constitution.[3] But some fiscal impact on the state treasury is the necessary result of prospective decrees forcing compliance with the Constitution. Edelman, 415 U.S. at 668. "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young." Id. The district court in this case correctly held that the doctrine of Ex parte Young allows Lynn's action to the extent he seeks prospective relief, specifically, a declaratory judgment and an injunction against "ongoing constitutional violations."

IV.

We now turn to Lynn's claim for prospective relief. Lynn argues that under Department of Revenue v. Kurth Ranch , 511 U.S. 767 (1994), the Drug Tax must be called a criminal penalty, not a civil

_____

[3] North Carolina has been the most aggressive of the states in enforcing its tax on illegal drugs. In 1993, for example, North Carolina collected over six million dollars, more than ten times as much money as the next highest state, Kansas. See Payoff From Taxing Drugs, News & Observer (Raleigh, NC), June 7, 1994, at A1. At oral argument counsel for North Carolina reported that the state had collected $26 million since 1990, all through forced collections.

10

tax. We agree and hold that the Drug Tax may not be enforced absent the constitutional safeguards that attach to criminal proceedings.

In Kurth Ranch the Supreme Court examined Montana's Dangerous Drug Tax Act. The Kurth family had a ranch in central Montana. They raised grain and livestock, but they also cultivated and sold marijuana. In 1987 Montana law enforcement officials raided the ranch, arrested the Kurths, and confiscated the marijuana. Six members of the Kurth family were charged with drug crimes under Montana law. All eventually pled guilty; two Kurths went to prison, and the others got suspended or deferred sentences. Kurth Ranch , 511 U.S. at 772. The county attorney also brought a civil forfeiture action, which the Kurth family settled by agreeing to forfeit certain cash and farm equipment. Id. Next, the Montana Department of Revenue attempted to collect $900,000 in taxes assessed against the Kurths under the Montana Dangerous Drug Tax Act. Collection efforts were stayed when the Kurths filed for Chapter 11 bankruptcy. Later, the bankruptcy court decided that the tax assessment was a form of double jeopardy. After the district court and the court of appeals for the Ninth Circuit affirmed, Montana brought the case to the Supreme Court. Id. at 773-76.

The Supreme Court also affirmed, holding that assessment of the Montana tax following state criminal proceedings violated the Double Jeopardy Clause:

> This drug tax is not the kind of remedial sanction that may follow the first punishment of a criminal offense. Instead, it is a second punishment within the contemplation of a constitutional protection that has deep roots in our history and jurisprudence, and therefore must be imposed during the first prosecution or not at all.

Id. at 784 (internal quotation marks and citation omitted). The Court reached its holding by discussing four features that rendered the tax a second punishment: (1) the high tax rate, id. at 780-81, (2) the deterrent purpose of the tax, id., (3) the fact that the tax was conditioned on the commission of a crime, id. at 781-82, and (4) the fact that the tax was levied on "`possession' of goods that no longer exist and that the taxpayer never lawfully possessed," id. at 783. "Taken as a

11

whole," the Court concluded, "this drug tax is a concoction of anomalies, too far removed in crucial respects from a standard tax assessment to escape characterization as punishment . . . ." Id.

The central question in this case, like that in Kurth Ranch, is whether the tax in question is, despite its label, a criminal penalty.**4** A "tax" can encompass any "pecuniary burden laid upon individuals or property for the purpose of supporting the government." New Jersey v. Anderson, 203 U.S. 483, 492 (1906). The North Carolina Drug Tax, as a pecuniary burden laid upon drug dealers, is in that sense a tax. But the question here is whether the tax is so punitive that the constitutional protections afforded to criminal defendants should attach to its enforcement. "`[T]here comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.'" Kurth Ranch, 511 U.S. at 779 (quoting A. Magnano Co. v. Hamilton, 292 U.S. 40, 46 (1934)). A penalty "may be termed a duty or tax and yet be a penalty. Its name does not determine its nature."**5** Fontenot v. Accardo, 278 F. 871, 874 (5th Cir. 1922). As we explain below, North Carolina's Drug Tax, like Montana's Dangerous Drug Tax, has enough punitive features that its nature is that of a criminal penalty, not a civil tax.

The North Carolina Drug Tax shares the first two features of the

_____

**4** Whether the statute imposes what amounts to a criminal sanction remains the proper inquiry. See Hudson v. United States, 1997 WL 756641 at *6 & n.6 (U.S. Dec. 10, 1997) (acknowledging that Kurth Ranch engaged in a proper analysis); see also id. at *10 (Stevens, J., concurring) (noting majority's reaffirmation of central holding of Kurth Ranch); id. at *13 (Breyer, J., concurring) (same).

**5** **Kurth Ranch** dictates that we analyze the tax according to its substantive effect, not its formal label. Id. at 779 (noting that "a tax is not immune from double jeopardy scrutiny simply because it is a tax"). Accord Lipke v. Lederer, 259 U.S. 557, 561 (1922) ("The mere use of the word `tax' in an act primarily designed to define and suppress crime is not enough to show that within the true intendment of the term a tax was laid."). Accordingly, the fact that North Carolina labels its tax an "excise tax," while Montana characterized its tax as a"property tax," does not affect our analysis.

12

Montana tax examined in <u>Kurth Ranch</u>: a high rate of taxation and a deterrent purpose. These features tend to show that the Drug Tax is punitive, although standing alone they might not be enough. Many taxes that are presumed valid, such as those on cigarettes and alcohol, are also high and motivated in part by deterrence. <u>See Kurth Ranch</u>, 511 U.S. at 780-81; <u>United States v. Sanchez</u>, 340 U.S. 42, 46 (1950) (upholding federal tax on marijuana). In <u>Kurth Ranch</u> the Court noted that Montana had taxed the drugs at about 400 percent of their market value. <u>Id.</u> at 780 n.17. Neither Montana nor the United States could offer an example of a tax on cigarettes, alcohol, or anything else that approached this rate. <u>Id.</u> The remarkably high tax rate, the Court concluded, was "at least consistent with a punitive character." <u>Id.</u> at 780. The deterrence factor, the Court said, was "beyond question." <u>Id.</u>

The rate of taxation imposed by the North Carolina Drug Tax yields an even higher penalty than the tax in <u>Kurth Ranch</u>. Here, Lynn was assessed a $194,000 tax for his possession of 970 grams of cocaine, a rate of about $200,000 per kilogram. The parties in this case have not estimated the market value of the cocaine seized from Lynn. A review of several federal cases, however, indicates that the market value for a kilogram of cocaine is about $25,000. <u>See</u>, <u>e.g.</u>, <u>United States v. Anderson</u>, 76 F.3d 685, 692 (6th Cir. 1996) (affirming trial court finding that market price was $22,500 per kilogram); <u>United States v. Sureff</u>, 15 F.3d 225, 228 (2d Cir. 1994) (concluding that defendant's statement "24 or 25" referred to sales price of kilogram of cocaine, in thousands); <u>United States v. Hicks</u>, 948 F.2d 877, 880 n.1 (4th Cir. 1991) (affirming sentence based on $32,000 per kilogram). Based on this estimate the Drug Tax imposes a liability of eight times the market value of the substance. North Carolina also assessed a $194,000 penalty for Lynn's failure to pay the tax within 48 hours of when he came into possession of the cocaine. The addition of the penalty makes the effective rate of taxation 1,600 percent, or sixteen times, the market value.[6] This shows that, like in <u>Kurth</u>

_____

[6] Purity levels are irrelevant in determining the amount of the tax. For assessment purposes a "quantity of marijuana or other controlled substance is measured by the weight of the substance whether pure or impure or dilute[.]" N.C. Gen. Stat. § 105-113.107 (1996). The record in this case does not reveal the purity level of the cocaine found at Lynn's house.

13

Ranch, the tax rate has no rational relationship to the market value of the drugs. In addition, the extremely high tax is"beyond question" intended "to deter people from possessing [illegal drugs]." Kurth Ranch, 511 U.S. at 780. Although the high tax rate and deterrent purpose lend support to the argument that the Drug Tax is a criminal penalty, "these features, in and of themselves, do not necessarily render the tax punitive." Id. at 781. We will therefore look at other features of the tax.

The Drug Tax also has the third feature discussed in Kurth Ranch: it is conditioned on the commission of a crime. In Kurth Ranch the Court explained that "[p]ersons who have been arrested for possessing marijuana constitute the entire class of taxpayers subject to the Montana tax." Kurth Ranch, 511 U.S. at 781-82. The situation is the same with North Carolina's Drug Tax. Counsel for North Carolina explained at oral argument that when a drug arrest or seizure is made, law enforcement officers send an arrest or seizure report to the Department of Revenue. The Department then assesses the tax liability and seizes any assets not already seized under federal and state criminal or civil drug forfeiture laws. Because an assessment of tax liability operates more broadly than an order of forfeiture, the Department can levy upon the remaining property of the taxpayer without proving the property's connection to a drug crime. **7**

_____

**7** The Drug Tax goes much further than state and federal drug forfeiture laws. The Supreme Court has said that most in rem civil forfeiture proceedings are properly characterized as civil, not criminal, and that in rem forfeiture proceedings generally do not violate the Double Jeopardy Clause when brought after a criminal prosecution. See, e.g., United States v. Ursery, 116 S. Ct. 2135, 2149 (1996). North Carolina's tax on illegal drugs takes asset confiscation to a different level. An assessment of Drug Tax liability, unlike an order of forfeiture, can be satisfied out of any property owned by the defendant, not just property linked to a drug crime. See N.C. Gen. Stat. § 105-113.111 (1996) ("The Secretary shall use all means available to collect the tax, penalty, and interest from any property in which the dealer has a legal, equitable, or beneficial interest."). Thus, unlike the in rem civil forfeiture situation, the Drug Tax sweeps too broadly to take advantage of the legal fiction that the property itself is guilty.

14

The Drug Tax is imposed on "dealers," i.e., persons who possess sufficient quantities of a "controlled substance" as that term is defined in the criminal code of North Carolina. North Carolina argues that dealers not yet arrested for drug crimes could, theoretically, pay the Drug Tax. See State v. Ballenger, 472 S.E.2d 572, 574-75 (N.C. Ct. App. 1996) (emphasizing that Drug Tax is not predicated upon whether taxpayer has been arrested or charged); cf. State v. Ballenger, 481 S.E.2d 84, 84 (N.C. 1997) (affirming Court of Appeals without explanation) (per curiam). The statute requires drug dealers to report the tax on a form prescribed by the Secretary of Revenue. See N.C. Gen. Stat. § 105-113.108 (1996). After payment, the Secretary is supposed to send the dealers stamps to affix to the drugs. See id. Presumably in an attempt to avoid conflict with the Fifth Amendment Self-Incrimination Clause, the Drug Tax statute provides that information obtained from the form cannot be used in a criminal prosecution. See id. § 105-113.112. Counsel for North Carolina admitted at oral argument, however, that he does not know of any dealer who has in fact self-reported and paid his Drug Tax bill. Counsel also admitted that the Secretary has not prepared a form for reporting and paying the tax, even though the statute says she is to "prescribe" one. Nor does North Carolina collect the tax from those who legitimately possess drugs, such as doctors who use morphine (a "controlled substance") in medical treatment. See id. § 90-89(b) (listing morphine as Schedule I controlled substance); see also id. § 105-113.107A (exempting from Drug Tax any "dealer who is authorized by law to possess the substance"). Once again, as in Kurth Ranch, persons arrested for drug crimes constitute the entire class of taxpayers generating revenue under the North Carolina Drug Tax. See also Kurth Ranch, 511 U.S. at 788 n.2 (Rehnquist J., dissenting) (commenting, after counsel for Montana described a Minnesota tax similar to the North Carolina Drug Tax, "Not surprisingly, when asked at oral argument `Does Minnesota collect any money off that scheme . . . . Not too many stamps being sold?', counsel for respondents admitted, amidst laughter, that he did not know the answer."). The theoretical possibility that a drug dealer could voluntarily pay the Drug Tax does not take the tax out of the criminal penalty category. The unused statutory reporting and payment scheme, while clever, is not enough to distinguish Kurth Ranch. The Drug Tax is still based on a criminal act.

The Drug Tax also has the fourth feature present in Kurth Ranch: the tax has no relationship to lawful possession. As the Court

15

explained, "[a] tax on `possession' of goods that no longer exist and that the taxpayer never lawfully possessed has an unmistakable punitive character." Id. at 783. In this case, as with the Montana tax, the taxpayer (Lynn) had no property right in the drugs, which had been confiscated by the time the Department of Revenue made its assessment. See 21 U.S.C. § 881(a)(1) (providing that "no property right shall exist in" controlled substances); J.A. 59 (Notice of Assessment dated March 2, 1993).

Kurth Ranch's consideration of lawful possession alludes to the distinction between license taxes and criminal penalties. A license fee exacts a cost for the "privilege of carrying on" a "lawful business or occupation." Black's Law Dictionary 921 (6th ed. 1990); Fontenot v. Accardo, 278 F. 871, 875 (5th Cir. 1922) (explaining that tax on liquor imposed during Prohibition was a criminal penalty, not license fee on "lawful business or occupation"). Payment of a license fee confers lawful possession. For example, tobacco and alcohol manufacturers, wholesalers, and retailers must pay steep taxes as a condition to legal operation of their businesses. See, e.g., N.C. Gen. Stat. § 105-113.74 (1996) (describing alcohol license taxes). In addition, lawful possession of cigarettes is conditioned on having tax stamps affixed to the product. See, e.g., id.  § 105-113.31 (possession of non-tax-paid cigarettes). In the case of marijuana or cocaine, however, payment of the Drug Tax does not confer a legal privilege to engage in drug dealing. Nor is payment of the tax simply a condition precedent to lawful possession. See id. § 105-113.105 ("Nothing in this Article may in any manner provide immunity from criminal prosecution for a person who possesses an illegal substance.").

In this context the Supreme Court has often cited the feature of lawful possession to distinguish between a license tax and a criminal penalty. In United States v. Sanchez, 340 U.S. 42, 46 (1950), for example, the Supreme Court upheld the federal Marihuana Tax Act, which imposed a $100 per ounce tax on transferees of marijuana who were not registered with the Treasury Department. [8] The rate of taxation on legally registered transferees, however, was only $1 per

_____

[8] The Marihuana Tax Act was repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236, 1292.

16

ounce. At the time, many states allowed state-licensed manufacturers and wholesalers to process and sell marijuana. Many state laws also allowed possession by apothecaries, researchers, physicians, dentists, persons for whom marijuana had been prescribed, and others. See Leary v. United States, 395 U.S. 6, 16-17 (1969). The Sanchez Court noted that by requiring transferees to register with the Treasury Department, the tax "implements the congressional purpose of restricting traffic in marihuana to accepted industrial and medicinal channels." Sanchez, 340 U.S. at 44. Cf. Minor v. United States, 396 U.S. 87, 97, 97-98 n.12 (1969) (noting that of the 400,000 registered narcotics dealers in 1967, only four were reported during that year for a violation of the narcotics laws). In this case, unlike Sanchez, there is no legislative intent to allow cocaine trafficking within any "accepted [ ] channels."

If payment of the Drug Tax conferred legal ownership, then the tax would amount to nothing more than an expensive licensing or excise fee. The fact that it does not is another strong indication that the tax is a criminal penalty. Compare Regal Drug Corp. v. Wardell, 260 U.S. 386, 392 (1922) (holding that tax on liquor during Prohibition is penalty); Lipke v. Lederer, 259 U.S. 557, 561 (1922) (same); and Fontenot v. Accardo, 278 F. 871, 875 (5th Cir. 1922) (same), with Sonzinsky v. United States, 300 U.S. 506, 513-14 (1937) (upholding license tax on firearms and distinguishing cases where subject of the tax is criminal); and United States v. Doremus , 249 U.S. 86, 94 (1919) (upholding constitutionality of Harrison Narcotic Drug Act, which imposed tax on "lawful business" in coca and opium; noting that license tax provisions "tend to keep the traffic aboveboard and subject to inspection by those authorized to collect the revenue"). We therefore conclude that the Drug Tax also shares the fourth feature examined in Kurth Ranch, the absence of a relationship to lawful possession.

The Kurth Ranch Court did not indicate that the features it cited were meant to be exclusive. However, the Drug Tax contains no features that allow us to distinguish Kurth Ranch . The rate of taxation is even steeper than the tax in Kurth Ranch. Unlike the application of a normal income tax on illegal activity, the Drug Tax is enforced only against criminals.**9** And unlike the marijuana tax upheld in Sanchez,

_____

**9 Kurth Ranch** does not affect the proper characterization of a tax on illegal income as civil in nature. The income tax subjects criminals, such

17

the Drug Tax does not contemplate lawful dealings in the product that is the subject of the tax. The Drug Tax singles out a class of persons who have engaged in criminal activity and subjects the class to a rate of taxation far beyond that faced by any legitimate taxpayer. As the Supreme Court said when it held that a Prohibition era tax was a criminal penalty,

> [C]ertainly we cannot conclude . . . that penalties for crime should be enforced through the secret findings and summary action of executive officers. The guarantees of due process of law and trial by jury are not to be forgotten or disregarded.

Lipke v. Lederer, 259 U.S. 557, 562 (1922). Accordingly, we hold that the Drug Tax is a criminal penalty.**10**

---

as drug dealers, bookmakers, and moonshiners, to the same tax obligations faced by law-abiding taxpayers. See Thomas v. Commissioner, 62 F.3d 97, 101 (4th Cir. 1995) (noting that taxpayer who failed to pay income tax on illegal drug income "is being treated no differently than any other person who has failed to pay income tax. .. . Unlike the defendants in Kurth Ranch, who were taxed because of their illegal activity, Thomas would face this tax liability regardless of the source of his income."). Taxing illegal income is simply an application of the broad scope of Internal Revenue Code § 61, which defines income as all income "from whatever source derived."

**10** In Hudson v. United States , 1997 WL 756641 (U.S. Dec. 10, 1997), the Supreme Court applied "traditional double jeopardy principles" and concluded that certain administrative sanctions (monetary penalties and disbarment) under the banking laws were not criminal punishment. Id. at *7. The Court in Hudson noted that the "clearest proof" of a sanction's punitive form and effect is required to overcome an indication of legislative intent to impose a civil sanction. Id. at *5, *7, *8, citing United States v. Ward, 448 U.S. 242, 249 (1980). This does not appear to make the challenger's burden any tougher than it already was. In any event, the crucial aspects of the North Carolina Drug Tax do provide clearest proof of punitive intent: although nominally labeled an"excise tax," the Drug Tax is enforced only against those arrested for drug crimes, and -- unlike routine license and excise taxes -- payment of the tax confers no legal privilege to possess or sell. See supra at 14-17.

18

V.

This case does not raise the same double jeopardy concerns as Kurth Ranch. In Kurth Ranch characterization of the tax as a criminal penalty triggered the protections of the Double Jeopardy Clause. In this case the Double Jeopardy Clause does not apply because it does not bar successive prosecutions by different sovereigns. See Abbate v. United States, 359 U.S. 187, 195 (1959). Only the United States prosecuted Lynn for cocaine possession, so the Double Jeopardy Clause does not bar North Carolina's enforcement of the Drug Tax even though it is a criminal penalty. Because the United States brought the prior criminal prosecution, North Carolina remained free to impose its own criminal sanctions.

VI.

Because the Drug Tax is in reality a criminal penalty, its enforcement must conform to the constitutional safeguards that accompany criminal proceedings. See Carbon Fuel Co. v. United Mine Workers, 517 F.2d 1348, 1349 (4th Cir. 1975) (holding that because contempt proceedings were properly characterized as criminal, not civil, judgment must be reversed because of denial of due process); see also Bush Ranch, Inc. v. E. I. DuPont de Nemours & Co. , 99 F.3d 363, 369 (11th Cir. 1996) ("[W]e must reverse the contempt order because the district court did not afford DuPont the procedural protections the Constitution requires for the imposition of criminal contempt sanctions."). "Some governmental exactions are so punitive that they may only be imposed in a criminal proceeding." Kurth Ranch, 511 U.S. at 793 (O'Connor, J., dissenting) (citing United States v. Ward, 448 U.S. 242, 248-49 (1980)). This conclusion is consistent with the holding in Kurth Ranch. As Justice Scalia noted in his dissent there, the majority's holding relied on the basic notion that the tax was equivalent to a criminal prosecution. "Assessment of a criminal punishment in a civil tax proceeding would violate not only the Double Jeopardy Clause, but all of the criminal-procedure guarantees of the Fifth and Sixth Amendments." Kurth Ranch, 511 U.S. at 807 (Scalia, J., dissenting). Accord id., 511 U.S. at 797 (O'Connor, J., dissenting) ("[P]resumably the State cannot tax anyone for possession of illegal drugs without providing the full panoply of criminal procedure protections found in the Fifth and Sixth Amendments, given the Court's

19

holding that `[t]he proceeding Montana initiated to collect a tax on the possession of drugs was the functional equivalent of a successive criminal prosecution.'"). Enforcing a criminal punishment in a civil proceeding is incompatible with the important constitutional distinctions between civil and criminal procedure:

> Civil Procedure is incompatible with the accepted rules and constitutional guaranties governing the trial of criminal prosecutions, and where civil procedure is prescribed for the enforcement of remedial sanctions, those rules and guaranties do not apply. Thus the determination of the facts upon which liability is based may be by an administrative agency instead of a jury, or if the prescribed proceeding is in the form of a civil suit, a verdict may be directed against the defendant; there is no burden upon the Government to prove its case beyond a reasonable doubt, and it may appeal from an adverse decision; furthermore, the defendant has no constitutional right to be confronted with the witnesses against him, or to refuse to testify; and finally, in the civil enforcement of a remedial sanction there can be no double jeopardy.

Helvering v. Mitchell, 303 U.S. 391, 402-04 (1938) (Brandeis, J.) (footnotes omitted). North Carolina cannot treat the imposition of its Drug Tax as if it is a civil sanction. It is a criminal penalty, and a taxpayer pursued for Drug Tax liability must be afforded all of the constitutional safeguards due a criminal defendant. **11**

_____

**11** Lynn also challenges the constitutionality of the Drug Tax by arguing that it is a bill of attainder passed by a state in violation of Article I, section 10 of the United States Constitution. A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding. See, e.g., United States v. Brown, 381 U.S. 437, 449-456 (1965). Because we hold that the Drug Tax is in reality a criminal penalty, future enforcement of the tax must be accompanied by appropriate judicial proceedings. Accordingly, we have no occasion to consider whether the Drug Tax is a bill of attainder.

20

VII.

The district court never reached the issue of whether the Drug Tax is a criminal penalty under Kurth Ranch. The court reasoned that because the Drug Tax is a "tax under State law," see 28 U.S.C. § 1341, the Tax Injunction Act prevents a district court from exercising subject matter jurisdiction over Lynn's claims for declaratory and injunctive relief. We disagree because a tax on illegal drugs that reaches the level of a criminal penalty under Kurth Ranch is not properly characterized as a "tax under State law."

The Tax Injunction Act provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. The Tax Injunction Act prohibits district court jurisdiction over an action if (1) the action is to "enjoin, suspend or restrain the assessment, levy or collection" of a state tax, (2) the tax is a "tax under State law," and (3) the state provides a "plain, speedy and efficient remedy" in its own courts. See International Lotto Fund v. Virginia State Lottery Dep't, 20 F.3d 589, 593 (4th Cir. 1994); San Juan Cellular Tel. Co. v. Public Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992).

The first element of the Tax Injunction Act is present. An injunction against the continued enforcement of the Drug Tax against Lynn would "enjoin" the "collection" of what has been labeled a state tax. Declaratory relief concerning state taxes is also barred by the Tax Injunction Act. See California v. Grace Brethren Church, 457 U.S. 393, 408 (1982). See also Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 299 (1943) ("[T]hose considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure.").

The Drug Tax lacks the second element, however. A criminal pen-

21

alty, however labeled, is not a "tax under State law" for Tax Injunction Act purposes. The Act "was initially `predicated upon the desirability of freeing, from interference by the federal courts, state procedures which authorize litigation challenging a tax only after the tax has been paid.'" International Lotto Fund , 20 F.3d at 593 (quoting Great Lakes, 319 U.S. at 301). The policy considerations that support the Tax Injunction Act do not extend to state criminal prosecutions, which raise different constitutional concerns than those present in assessing and collecting an ordinary state tax. See Steffel v. Thompson, 415 U.S. 452, 472 n.20 (1974) (noting that there is no statutory counterpart of Tax Injunction Act applicable to state criminal prosecutions).[12]

The few cases that address the issue confirm that federal courts have jurisdiction to examine a tax that is in reality a criminal penalty. "[I]n such a setting, where the so-called tax has clearly punitive qualities, it may, if invalid, be enjoined." Denton v. City of Carrollton, 235 F.2d 481, 485 (5th Cir. 1956) (citations omitted) (holding that despite Tax Injunction Act district court should have considered constitutional questions arising from steep license tax on labor organizers). Cf. Lipke v. Lederer, 259 U.S. 557, 561-62 (1922) (holding that because Prohibition era tax on liquor was a penalty, statutory mandate that "[n]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court" did not apply); Regal Drug Corp. v. Wardell, 260 U.S. 386, 392 (1922) (same).[13] Accord-

_____

[12] We reiterate that the Eleventh Amendment, discussed supra, operates to protect the state treasury from direct interference by the federal courts. At issue in this case is the future enforcement of a criminal penalty, not the ancillary effect on the financing of state government. Cf. Edelman v. Jordan, 415 U.S. 651, 668 (1974) ("Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex Parte Young[.]"); Green v. Mansour, 474 U.S. 64, 68 (1985) ("[T]he availability of prospective relief . . . gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

[13] The district court relied on a series of cases distinguishing taxes from regulatory fees, which are not subject to the Tax Injunction Act. See, e.g., Bidart Bros. v. California Apple Comm'n, 73 F.3d 925, 931 (9th Cir.

ingly, we reverse the district court's holding that jurisdiction is barred by the Tax Injunction Act. The Tax Injunction Act does not apply to state taxes that are in reality criminal penalties. **14**

VIII.

For the foregoing reasons we hold that the Controlled Substance Tax is a criminal penalty, and we reverse the district court on that point. North Carolina's enforcement scheme must provide the constitutional safeguards that attach to criminal prosecutions. We do not believe, however, that a remand is necessary in this case. In their complaint the plaintiffs ask for monetary damages, declaratory relief, and injunctive relief. Their request for monetary damages is barred by the Eleventh Amendment and for failure to state a claim, and we affirm the district court on those determinations. Although we have declared that the Drug Tax is a criminal penalty, we do not believe that injunctive relief is necessary at the present time. Even though North Carolina has only partially satisfied its Drug Tax assessment against Lynn, there is no pending state proceeding to be enjoined. Nor is there any indication that North Carolina will not comply with this opinion in the future. The judgment of the district court is therefore

AFFIRMED IN PART AND REVERSED IN PART.

_____

1996) (considering as factors "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed"). The district court concluded that the Drug Tax was not a regulatory fee. The cases discussing regulatory fees do not help in the analysis in this case, however. Regulatory fees are civil and remedial in nature. A criminal penalty raises different constitutional concerns that outweigh the state's interest in the orderly administration of taxes. We simply note that no court has held that a criminal penalty, although labeled as a tax, falls within the ambit of the Tax Injunction Act.

**14** Because the Drug Tax is not a"tax under State law," we need not consider the third element, that is, whether Lynn has a "plain, speedy and efficient remedy" in state court.

23